FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JUL 2 4 2018

CLERK
U.S. DISTRICT COURT
MIDDLE DIST. OF ALA.

UNITED STATES OF AMERICA )
)
v. )            CR. NO. 2:18-CR-116-MHT
)            [18 U.S.C. § 371;
G. FORD GILBERT, )
a/k/a "Gregory Gilbert," )            18 U.S.C. § 666;
MARTIN J. CONNORS, and )            18 U.S.C. § 1952;
RANDALL M. DAVIS )            18 U.S.C. § 1001;
)            18 U.S.C. § 2]
)
)            SUPERSEDING INDICTMENT

The Grand Jury charges:

## I. INTRODUCTION

At all times relevant to this Superseding Indictment:

### A.    Trina Health

1.      Trina Health, LLC (Trina Health) was a Nevada limited liability corporation. Previously, Trina Health was registered as a California corporation. Trina Health was headquartered in McClellan Park, California. Trina Health operated, through license agreements, outpatient diabetes treatment clinics. Each clinic employed one or more health care providers to oversee the diabetes treatment being provided at those clinics.

2.      Defendant G. Ford Gilbert, a/k/a "Gregory Gilbert," a California resident, was the founder, president, and chief executive officer (CEO) of Trina Health. In or about 1975, Gilbert obtained a juris doctor degree and became a practicing attorney in California. Subsequently, Gilbert attended medical school, but did not graduate. He later obtained a doctor of philosophy degree from an online educational institution. Gilbert claimed that he developed the pump-based treatment provided at Trina Health clinics.

3.     At its clinics, health care providers affiliated with Trina Health or a Trina Health licensee provided "Artificial Pancreas Treatment." This treatment was a form of outpatient intravenous insulin infusion therapy (OIVIT). Chronic intermittent intravenous insulin therapy was another term for OIVIT. The treatment required a patient to spend three hours in a chair at a Trina Health clinic. During those three hours, the patient received, through intravenous injection, a series of infusions of insulin. Trina Health recommended that a patient undergo Artificial Pancreas Treatment sessions once per week in order for the patient to see beneficial health outcomes. In promotional materials, Trina Health stated that the Artificial Pancreas Treatment could be used to treat more than diabetes. Among the other conditions that Trina Health claimed that the Artificial Pancreas Treatment could treat were: neuropathy, hypoglycemia, hypertension, chronic fatigue, wounds, and erectile dysfunction.

4.     Trina Health operated as a "pyramid scheme." That is, Trina Health generated revenue by recruiting individuals into its business based on the promise that those individuals would make money by recruiting others into the business. Specifically, Trina Health authorized certain first-level individuals the right to sell to second-level investors exclusive rights to operate Trina Health-affiliated diabetes treatment clinics within designated geographic areas. When a second-level investor entered into an agreement to operate Trina Health-affiliated clinics within a designated geographic area and paid a license fee to Trina Health for doing so, the first-level individual who recruited the second-level individual would get a cut of that licensee fee as a finder's fee.

5.     T.M., a California resident, was the chief operating officer (COO) of Trina Health.

**B.     CP Homes**

2

6.       CP Homes, LLC (CP Homes) was  a Texas limited liability corporation.  CP Homes's primary business was operating assisted living and memory-care residences in Texas and Alabama.

7.       T.G., a Texas resident, was the CEO of CP Homes.

8.       A.H., a Texas resident, was the COO of CP Homes.

9.       A.B., a Texas resident, was the public relations manager for CP Homes.

10.       As described below, in or about 2014, CP Homes formed a wholly owned subsidiary, APT Foley, LLC (APT Foley) for the purpose of opening and operating a Trina Health-affiliated clinic in Foley, Alabama.

11.       As described below, in or about 2015, CP Homes formed a wholly owned subsidiary, APT Fairhope, LLC (APT Fairhope) for the purpose of opening and operating a Trina Health-affiliated clinic in Fairhope, Alabama.

**C.       THCP and THCP Bham**

12.       C.B., a Georgia resident, was a friend and former business associate of Defendant Gilbert's.

13.       As described below, in or about 2015, C.B. formed Trina Health Care Partners (THCP) as a Wyoming limited liability corporation.  The purpose of THCP was to own subsidiary entities.  Those subsidiary entities would open and operate Trina Health-affiliated clinics.  C.B. was the controlling shareholder and CEO of THCP.

14.       As described below, in or about 2015, C.B. formed THCP Bham AL 1, LLC (THCP Bham) as a Wyoming limited liability corporation and a subsidiary of THCP.  The purpose of THCP Bham AL 1 was to open and operate a Trina Health-affiliated clinic in Hoover, Alabama.  CB was the CEO of THCP Bham.

3

15.     M.K. was the organizer of a group of individuals who invested in THCP Bham.

**D.     BCBS-AL**

16.     Blue Cross Blue Shield of Alabama (BCBS-AL) was a nonprofit, private health insurance company headquartered in Birmingham, Alabama.  BCBS-AL provided coverage to over 3,000,000 people.  That consisted of over 90 percent of the total market for health insurance in Alabama.

17.     BCBS-AL provided, through contracts with components of the government of the state of Alabama, health care benefits to employees and retirees of the state government.  When BCBS-AL added items or services to state employees' and retirees' health insurance plans, the state of Alabama bore the cost of paying for such additional items or services.  As such, the question of whether BCBS-AL would cover the OIVIT, including the Artificial Pancreas Treatment constituted business, transactions, and series of transactions of the state of Alabama involving things of value of $5,000 or more.

18.     BCBS-AL operated a Network Integrity office.  This office's mission, in part, was to ensure that BCBS-AL did not reimburse health care providers for items or services that were not covered by a patient's health insurance policy.

19.     When Network Integrity officials of BCBS-AL requested that providers repay money to BCBS-AL, the providers had certain appeal rights.  The providers could first participate in a meeting with the Network Integrity officials and attempt to explain why the money should not be repaid to BCBS-AL.  This meeting was considered a first-level review.  If the Network Integrity officials concluded, after the meeting, that the money was still owed, then the providers could request a second-level review.  That review would be completed by an outside, independent consultant.

4

20.     BCBS-AL operated a Medical Policy office. This office's mission, in part, was to determine which medical items or services were medically necessary for the treatment of BCBS-AL's members, and, as such, would be covered under health insurance policies.

21.     Lobbyist A was the Vice President, Governmental Affairs for BCBS-AL.

22.     Attorney B was an attorney who worked in the BCBS-AL legal office. He served as BCBS-AL's Executive Counsel.

**E.     Regions Financial Corporation**

23.     Regions Financial Corporation (Regions) was a bank and financial services corporation headquartered in Birmingham.

24.     In the course of its business activities, Regions extended loans and lines of credit to customers who resided in Alabama.

25.     Attorney A was an attorney employed by a law firm and retained by Regions to pursue debt collection litigation when customers of Regions failed to repay loans.

**F.     Alabama State Government**

26.     Alabama was a state. The government of the state of Alabama received federal assistance in excess of $10,000 during the one-year period beginning January 1, 2015 and ending December 31, 2015. The government of the state of Alabama again received federal assistance in excess of $10,000 during the one-year period beginning January 1, 2016 and ending December 31, 2016.

27.     The Alabama Legislature was the legislative branch of the Alabama state government. The Alabama Legislature was a bicameral body composed of the Alabama House of Representatives and the Alabama Senate. The Alabama House of Representatives consisted of 105 members with each member elected from a single-member district. The Alabama Senate

5

consisted of 35 members with each member elected from a single-member district.

28.     Before being enacted into law, a bill had to be introduced into either the Alabama House of Representatives or the Alabama Senate and then approved by a majority vote of both bodies.

29.     The Alabama Legislative Reference Services Agency (LRS) was a non-partisan support agency of the Alabama Legislature. The LRS Legal Division provided bill drafting and legal research services to the members of the Alabama Legislature. Before a member of the Alabama Legislature could introduce a bill into one of the chambers, the LRS was required to ensure that the draft bill satisfied the Alabama Legislature's style requirements. Accordingly, all draft bills had to be submitted to the LRS before introduction. Only a member of the Alabama Legislature, or a person specifically authorized by a member, could submit a draft bill to the LRS.

30.     The Speaker of the Alabama House of Representatives presided over that body.

31.     All bills introduced into the Alabama House of Representatives were referred by the Speaker to a standing committee. This was because Section 62 of the Constitution of Alabama provided, "No bill shall become a law until it shall have been referred to a standing committee of each house, acted upon by such committee in session, and returned therefrom, which facts shall affirmatively appear upon the journal of each house."

32.     The Commerce and Small Business Committee was a standing committee of the Alabama House of Representatives.

33.     M.D. was a member of the staff of the Small Business and Commerce Committee.

**G.     Alabama Legislators**

34.     Defendant-Representative Randall M. Davis was a member of the Alabama House of Representatives. Davis represented House District 96, which consisted of portions of

6

Baldwin County and Mobile County, Alabama. As a member of the Alabama Legislature, Davis was an agent of the state of Alabama. Davis was not a member of the Commerce and Small Business Committee. During some or all of the relevant period, Davis was a member of the majority party and was the Majority Whip of the Alabama House of Representatives.

35. Representative Micky Ray Hammon was a member of the Alabama House of Representatives. Hammon represented House District 4, which consisted of portions of Limestone County and Morgan County, Alabama. From in or about 2010 until in or about 2017, Hammon was a member of the majority party and was the Majority Leader of the Alabama House of Representatives. Hammon was also a member of the Commerce and Small Business Committee. As a member of the Alabama Legislature, Hammon was an agent of the state of Alabama. On or about September 25, 2017, Hammon pleaded guilty to one count of mail fraud, in violation of Title 18, United States Code, Section 1341. See United States v. Micky Ray Hammon, No. 2:17-CR-427-MHT-CSC (M.D. Ala.). Hammon is, therefore, not charged in this Superseding Indictment. Hammon was a close friend of Defendant-Representative Davis.

36. Representative Jack D. Williams was a member of the Alabama House of Representatives. Williams represented House District 47, which consisted of portions of Jefferson County, Alabama. Williams was a member of the majority party and was the chairman of the Commerce and Small Business Committee of the Alabama House of Representatives. Williams is not charged in this Superseding Indictment.

37. State Senator A was a member of the Senate. State Senator A represented all or portions of Jefferson County and Shelby County, Alabama. State Senator A was perceived by some other legislators as being able to influence BCBS-AL.

38. State Representative A was a member of the Alabama House of Representatives.

7

State Representative A represented all or portions of Baldwin County, Alabama.  State Representative A was a diabetic.  State Representative A was not a member of the Commerce and Small Business Committee.

39.    State Representative B was a member of the Alabama House of Representatives. State Representative B represented all or portions of Clay County, Coosa County, and Talladega County, Alabama.  State Representative B was known in the Alabama House of Representatives as having expertise in health care-related legislation.

40.    State Representative C was a member of the Alabama House of Representatives. State Representative C represented all or portions of Bibb County, Chilton County, and Shelby County, Alabama.  State Representative C was perceived by some other legislators as being able to influence BCBS-AL.

41.    State Representative D was a member of the Alabama House of Representatives. State Representative D represented all or portions of Montgomery County, Alabama.  State Representative D was a member of the Commerce and Small Business Committee.

**F.    Alabama Ethics Commission**

42.    The Alabama Ethics Commission was an agency of the Alabama state government.  Among the Alabama Ethics Commission's duties were: (1) gathering and retaining information regarding the economic interests of public officials; and (2) gathering and retaining information regarding activities related to lobbying of state government officials.

43.    Title 36, Section 36-25-14 of the Code of Alabama required that all public officials, including legislators, submit to the Alabama Ethics Commission annual statements of economic interest forms.  On those forms, public officials were required to disclose, among other things, any entity in which the public official or his or her spouse held an ownership interest of

five percent or greater.

44.     Title 36, Section 36-25-1 of the Code of Alabama defined "lobbying," in part, as "promoting, opposing, or in any manner influencing or attempting to influence the introduction, defeat, or enactment of legislation before any legislative body." That section defined "lobbyist," in part as "[a] person who receives compensation or reimbursement from another person, group, or entity to lobby." The section also defined "principal," as "[a] person or business which employs, hires, or otherwise retains a lobbyist."

45.     Title 36, Section 36-25-18 of the Code of Alabama required that all lobbyists, within 10 days of beginning lobbying activities, submit to the Alabama Ethics Commission registration forms declaring their principals. Such forms were required to be signed by the principal or the principal's representative.

**G.     Lobbyists**

46.     Defendant-Lobbyist Martin J. Connors was a resident of Alabama and a lobbyist registered with the Alabama Ethics Commission.

47.     As noted, Lobbyist A was the Vice President, Governmental Relations for BCBS-AL. Lobbyist A was, therefore, a lobbyist for BCBS-AL and BCBS-AL was the principal for Lobbyist A.

48.     Lobbyist B a lobbyist registered with the Alabama Ethics Commission. A Birmingham-based law firm employed Lobbyist B. As described below, from in or about November of 2015 through in or about February of 2016, Lobbyist B did lobbying work for CP Homes and Trina Health.

49.     Lobbyist C was a lobbyist registered with the Alabama Ethics Commission. Lobbyist C owned a Montgomery-based contract lobbying firm. As described below, in or about

9

March of 2016, Lobbyist C had meetings with Defendant Gilbert regarding the introduction of legislation adverse to the interests of BCBS-AL.

50.     Lobbyist D was a lobbyist registered with the Alabama Ethics Commission. Lobbyist D owned a Montgomery-based contract lobbying firm.  As described below, from in or about April of 2016 through in or about June of 2016, Lobbyist D did lobbying work for Trina Health.

## II.  ALABAMA LEGAL BACKGROUND

At all times relevant to this Superseding Indictment:

51.     Title 13A, Section 13A-10-61 of the Code of Alabama provided,

(a) A person commits the crime of bribery if:

(1) He offers, confers, or agrees to confer any thing of value upon a public servant with the intent that the public servant's vote, opinion, judgment, exercise of discretion or other action in his official capacity will thereby be corruptly influenced; or

(2) While a public servant, he solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that his vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be corruptly influenced.

52.     Title 36, Section 36-25-5.1(a) of the Code of Alabama provided, "No lobbyist, subordinate of a lobbyist, or principal shall offer or provide a thing of value to a public employee or public official or to a family member of the public employee or family member of the public official; and no public employee or public official or family member of the public employee or family member of the public official shall solicit or receive a thing of value from a lobbyist, subordinate of a lobbyist, or principal."

53.     Title 36, Section 36-25-1(27) of the Code of Alabama provided, whenever used in Chapter 25 of Title 36 of the Code of Alabama (consisting of the above-described sections), the

10

phrase "public official" meant: "Any person elected to public office, whether or not that person

has taken office, by the vote of the people at state, county, or municipal level of government or

their instrumentalities, including governmental corporations, and any person appointed to a

position at the state, county, or municipal level of government or their instrumentalities,

including governmental corporations.

## III. FACTUAL BACKGROUND

### A.   March of 2009: CMS Issues 2009 Non-Coverage Decision Memorandum

54.     On or about December 23, 2009, the Centers for Medicare and Medicaid Services

(CMS) issued a decision memorandum stating that CMS had determined that "evidence [did] not

support a conclusion that outpatient intravenous insulin therapy [(OIVIT)] improves health

outcomes in Medicare beneficiaries." Accordingly, CMS announced that it would not cover the

cost of such therapy, like the Artificial Pancreas Treatment provided by Trina Health. On or

about March 30, 2010, CMS issued a revised decision memorandum. That revised memorandum

did not change the substantive portions of the December 23, 2009 memorandum. Many private

health care benefit plans generally followed CMS's coverage determinations.

55.     Around the time that it issued the non-coverage decision memorandum, CMS

assigned a Healthcare Common Procedure Coding System (HCPCS) code for OIVIT. That code

was G9147. CMS instructed health care providers to use that code when submitting claims for

OIVIT. Because the first character in the code was "G," the CMS computer systems would

recognize the code as being for a non-covered treatment and then deny the claim. Private health

care benefit programs generally required health care providers to use HCPCS codes when

submitting claims. Those programs also would deny claims that began with the symbol "G."

56.     After CMS issued its non-coverage decision memorandum, Trina Health began to

enter into license agreements with individuals and businesses. Those agreements authorized the

11

licensees to open Trina Health-affiliated clinics in designated geographic locations. The

agreements obligated the licensees to pay Trina Health fixed sums for each new clinic

established, fixed sums for each chair installed within a new clinic, and percentages of annual

gross profits. By 2015, Trina Health-affiliated clinics operated in various places, including

California, Mississippi, Arizona, Nevada, and India.

## B.      2014 and Early 2015: Trina Health Expands Into Southern Alabama

57.      On or about February 3, 2014, Trina Health entered into a license agreement with

CP Homes for CP Homes to open Trina Health-affiliated clinics in southern Alabama. In or

about August of 2014, APT Foley, a subsidiary of CP Homes, opened a Trina Health-affiliated

clinic in Foley. In or about February of 2015, APT Fairhope, also a subsidiary of CP Homes,

opened a Trina Health-affiliated clinic in Fairhope.

58.      Although CMS and BCBS-AL did not cover OIVIT, the Foley and Fairhope Trina

Health-affiliated clinics initially generated revenue. The clinics were profitable because the

Trina Health billing employees refrained from using the HCPC code of G9147 on the claims

they submitted to CMS, BCBS-AL, and other health care benefit programs. Rather, they

submitted claims using the Current Procedural Terminology (CPT) codes assigned to the

component parts of the treatment. This form of health care fraud—manipulating and altering

billing codes so as to maximize reimbursement—is commonly referred to as "unbundling." As a

result of this unbundling, health care benefit programs paid around $600 per three-hour treatment

session.

## C.      2014 and Early 2015: C.B. Prepares to Open Trina Health-Affiliated Clinics in Northern Alabama

59.      In or about 2013, C.B., a longtime acquaintance of Defendant Gilbert's, became

interested in opening a Trina Health-affiliated clinic. After studying diabetes rates in various

areas, C.B. decided that he wanted to open a clinic in Alabama.  He based this decision on the fact that Alabama had one of the country's highest diabetes rates nationally.

60.     C.B. did not personally have the funds necessary to open a Trina Health-affiliated clinic.  Thus, he recruited investors.  In or about May of 2014, C.B. contacted Representative Hammon, a person with whom C.B. had participated in previous business deals.  C.B. knew that Hammon did not personally have any funds available to invest in opening a Trina Health-affiliated clinic.  However, C.B. hoped that, in light of the political office Hammon held, Hammon would be able to put C.B. in contact with individuals who were able and willing to invest in a Trina Health-affiliated clinic.

61.     Upon finding out about the business opportunity, Representative Hammon shared the details of the opportunity with Defendant-Representative Davis, Hammon's close friend.  Like Hammon, Davis lacked sufficient funds to invest in a Trina Health-affiliated clinic.  However, Davis was interested in the venture.  Accordingly, both Hammon and Davis agreed to actively try to find people willing and able to invest in a Trina Health-affiliated clinic to be located in northern Alabama.  C.B. promised both Hammon and Davis that he (C.B.) would convey a five-percent ownership interest in the to-be-formed business to any person who recruited an investor.  On or about May 26, 2014, Davis sent an email to C.B. accepting C.B.'s offer.  In that email, Davis wrote that he hoped that they would "make millions on this deal."

62.     From in or about May of 2014 through in or about April of 2015, Representative Hammon and Defendant-Representative Davis actively solicited investments in a northern Alabama Trina Health-affiliated clinic venture.  In or about February of 2015, Hammon, Davis, and C.B. toured the Fairhope Trina Health-affiliated clinic.  During this tour, Hammon, Davis, and C.B. met Defendant Gilbert, who was visiting Alabama from his California home.  Gilbert

13

proceeded to describe to Hammon, Davis, and C.B. how the Artificial Pancreas Treatment worked. He also assured them that any northern Alabama Trina Health-affiliated clinic would perform a public service and would be profitable.

63.     Meanwhile, in or about February of 2015, C.B. formed THCP. C.B. was the controlling shareholder of THCP. C.B. intended for THCP to be the majority owner of subsidiary corporations that C.B. intended to establish. The subsidiary corporations would own and operate Trina Health-affiliated clinics. Soon after its formation, THCP entered into a license agreement with Trina Health. Under that agreement, THCP acquired exclusive rights to open clinics in Alabama and various other locations. For these rights, THCP agreed to pay Trina Health: (1) $100,000 for each new clinic established; (2) fees of $16,000 for each chair installed in each new clinic (with each clinic having a minimum of 12 chairs); and (3) a royalty fee of 5 percent of the gross revenues of each clinic. THCP also agreed to pay an additional 5 percent of gross revenues to Trina Health in exchange for Trina Health performing billing services for TCHP's Trina Health-affiliated clinics.

64.     In or about May of 2015, Representative Hammon identified a group of investors who were willing and able to provide sufficient funding to open a Trina Health-affiliated clinic in the Birmingham area. In light of the promise of funding, on or about June 1, 2015, C.B. formed THCP Bham AL 1, LLC (THCP Bham), a Wyoming limited liability corporation and a subsidiary of TCHP. THCP Bham existed to operate, as a sub-licensee of THCP, a Trina Health-affiliated clinic in the metropolitan area surrounding Birmingham. C.B. was the president of THCP Bham. Around the same time, C.B. established an account in the name of THCP Bham at a Wells Fargo & Company (Wells Fargo) bank branch.

65.     In or about May of 2015, four investors—led by M.K. and each recruited through

14

Representative Hammon's marketing efforts—wired a total of $390,000.00 into the bank account held by THCP Bham. In exchange for recruiting these investors, THCP Bham paid Hammon $12,500.00. THCP Bham CEO C.B. also offered Hammon a five percent interest in THCP Bham. Because Alabama law would have required Hammon to disclose—on annual statement of economic interest forms he was required to file with the Alabama Ethics Commission—an ownership interest of five percent or more in any firm, Hammon asked that C.B. grant him an interest of less than five percent. Accordingly, C.B. gave Hammon a four percent ownership interest in THCP Bham. Hammon paid nothing for that ownership interest.

66.     From in or about May of 2015 through in or about September of 2015, Representative Hammon labored to open a Trina Health-affiliated clinic in the Birmingham area. For example, Hammon worked with a real estate agent to locate office space that could be rented and converted into a clinic. He ultimately found a location on Lorna Road in Hoover, Alabama. Hammon then negotiated a lease with the owner of the office space. After doing so, Hammon oversaw the tenant improvements necessary to convert the office space into a suitable Artificial Pancreas Treatment clinic. Hammon also assisted TCHP Bham CEO C.B. in hiring a physician who would serve as the clinic's "medical director," and thus oversee the treatments provided at the clinic. During this period, THCP Bham paid Hammon approximately $16,000.00 to compensate him for the work he was doing.

67.     Also during this period, Defendant-Representative Davis continued to actively recruit investors into the new Hoover Trina Health-affiliated clinic or into other prospective Trina Health-affiliated clinics to be opened in Alabama. For example, on or about June 25, 2015, Davis sent an email to Representative Hammon. In that email, Davis wrote that he had "a meeting with Gov. Bentley this morning and two potential investors this afternoon." He closed

15

the message by writing, "It is nice to be out of Session and totally focused on this great healthcare model."

**D.     Spring and Sumer of 2015:  BCBS-AL Decides Not to Reimburse for the Artificial Pancreas Treatment and Requests Refunds**

68.     In or about March of 2015, officials within the BCBS-AL Network Integrity office began investigating whether the claims submitted on behalf of the health care providers employed by the Trina Health-affiliated clinic in Foley were "unbundled."  That is, the BCBS-AL officials sought to determine whether those claims contained fragmented billing codes intended to maximize revenue.  To make that determination, the BCBS-AL officials obtained medical records from the Foley Trina Health-affiliated clinics.  Upon a close examination of those records, the BCBS-AL officials determined that the medical services provided at the Foley clinic constituted OIVIT.  As such, BCBS-AL determined that the claims submitted for the providers should have included the HCPC code G9147.  However, the claims were unbundled in that they did not consist of the single code G9147, but rather consisted of several CPT codes representing the various component parts of the treatment.  The claims submitted included the CPT codes for: (1) a glucose blood test; (2) an outpatient office visit for an established patient; (3) an outpatient office visit for a new patient; (4) therapeutic, prophylactic, and diagnostic injections and infusions; and (5) use of an infusion pump in the office setting.

69.     On or about May 26, 2015, the BCBS-AL Network Integrity officials sent letters to the health care providers employed by the Trina Health-affiliated clinic in Foley.  Those letters requested that each provider refund to BCBS-AL money wrongly paid to reimburse for Artificial Pancreas Treatments.  Subsequently, on or about May 26, 2015, BCBS-AL sent additional letters to the Foley providers.  Those letters explained the basis for BCBS-AL's refund request.  In the letters, BCBS-AL stated that the treatment provided at the clinic did "not meet Blue Cross and

16

Blue Shield of Alabama's medical criteria for coverage and is considered investigational due to the lack of published peer-reviewed literature." The letters instructed the providers to "please insure that claims for [OIVIT] are billed appropriately with HCPCS code G9147 for the correct application of our member's benefits." Upon receipt of these letters, the providers shared them with company officials at CP Homes. The CP Homes officials then transmitted them to Defendant Gilbert.

70.     On or about May 30, 2015, Defendant Gilbert sent a letter to the health care providers employed by the Trina Health-affiliated clinic in Foley. In that letter, Gilbert wrote, "Trina Health is very confident that BCBS of Alabama has no proper basis for the claims made." He then assured them that Trina Health would provide legal representation for them in any coverage dispute with BCBS-AL. At the conclusion of the letter, Gilbert wrote, "Finally, the Alabama Legislature is likely to pass a special private bill recognizing the Artificial Pancreas Treatment as a preferred model of treatment."

71.     On or about June 9, 2015, Defendant Gilbert sent two letters to BCBS-AL's Senior Network Integrity Representative. He wrote the letters on the letterhead of "Law Office of G. Ford Gilbert." In those letters, he appealed BCBS-AL's refund requests made to the two health care providers employed by the Trina Health-affiliated clinic in Foley.

72.     On or about July 21, 2015, the Medical Policy office of BCBS-AL issued a draft policy memorandum regarding CIIIT (another term for OIVIT). In that memorandum, the officials concluded, "Chronic intermittent intravenous insulin therapy does not meet Blue Cross and Blue Shield of Alabama's medical criteria for coverage and is considered investigational." In reaching this conclusion, the officials stated that "[t]he published evidence is considered insufficient to determine that the use of CIIIT in patients with insulin-dependent diabetes 73 the

net health outcome."

73.     On or about July 31, 2015, BCBS-AL Network Integrity officials sent letters to the health care providers employed by the Trina Health-affiliated clinic in Fairhope.  Those letters requested that each provider refund to BCBS-AL money wrongly paid to reimburse for Artificial Pancreas Treatments.

74.     On or about August 3, 2015, the health care providers employed by the Trina Health-affiliated clinics in Foley participated in first-level appeal meeting with the BCBS-AL Network Integrity officials.  Defendant Gilbert attended the meeting as the legal counsel for the health care providers.  During that meeting, Gilbert argued that the Artificial Pancreas Treatment was not a form of OIVIT and was thus not subject to the G9147 code requirement.  He also requested a subsequent meeting with the BCBS-AL Medical Policy officials so that he could urge BCBS-AL to reconsider its decision not to cover OIVIT.  After the meeting, the Network officials denied the first-level appeal and asked that the providers refund the money.

75.     On or about August 15, 2015, Defendant Gilbert sent a letter to BCBS-AL's Senior Network Integrity Representative stating his intention of representing the health care providers employed by the Trina Health-affiliated clinic in Fairhope in their appeals of the July 31, 2015 refund requests.  In that letter, he asked that BCBS-AL dispense with a first-level appeal of the refund determination and proceed to a second-level, independent review of the refund determination.

76.     On or about August 20, 2015, Defendant Gilbert sent a letter to BCBS-AL's Senior Network Integrity Representative.  In that letter, he accused the BCBS-AL officials of using the August 3, 2015 meeting as "a sham tactic to lure Medical Providers into a sense of believing that a proper meeting on appeal would be held, when there was no intention by

Insurance Company to do so."  Gilbert requested a second-level, independent review of BCBS-

AL's denial of the refund appeal of the health care providers employed by the Trina Health-

affiliated clinic in Foley.

## IV.  THE CHARGES

### COUNT 1
(Conspiracy)

77.     The factual allegations contained in paragraphs 1 through 76 of this Superseding

Indictment are hereby realleged and incorporated herein as if copied verbatim.

78.     Beginning in or about February of 2015 and continuing until in or about June of

2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the

defendants,

> G. FORD GILBERT,
> a/k/a "Gregory Gilbert,"
> MARTIN J. CONNORS, and
> RANDALL M. DAVIS,

as well as others, both known and unknown, including, but, not limited, to, Representative Micky

Hammon, did knowingly and intentionally conspire, combine, and agree with themselves and

others, to commit offenses against the United States, in violation of Title 18, United States Code,

Section 371.

## OBJECTS OF THE CONSPIRACY

79.     It was an object of the conspiracy to corruptly give, offer, and agree to give

anything of value to any person intending to influence or reward an agent of the state of Alabama

in connection with any business, transaction, or series of transactions involving anything of value

of $5,000.00 or more of the state of Alabama, a government that receives more than $10,000.00

19

under a federal program during any one-year period, in violation of Title 18, United States Code, Section 666(a)(2); and

80.     It was an object of the conspiracy to corruptly solicit, demand, accept, and agree to accept anything of value from any person intending to be influenced or rewarded in connection with any business, transaction, or series of transactions involving anything of value of $5,000.00 or more of the state of Alabama, a government that receives more than $10,000.00 under a federal program during any one-year period, in violation of Title 18, United States Code, Section 666(a)(1)(B).

## PURPOSE OF THE CONSPIRACY

81.     The purpose of the conspiracy was for Defendant Gilbert to persuade or force BCBS-AL to cover OIVIT and for Representative Hammon and Defendant-Representative Davis to enrich themselves. To achieve these goals, the defendants agreed that Gilbert would provide things of value to Hammon and to Davis as gratuities for and to induce Hammon and Davis to use political clout to benefit Trina Health and its affiliated entities by:

a.     Corruptly influencing and attempting to corruptly influence, and causing other public officials to corruptly influence and attempt to corruptly influence BCBS-AL's determination as to whether it would voluntarily cover OIVIT, including the Artificial Pancreas Treatment offered at Trina Health-affiliated clinics, with that determination constituting the business of a government agency involving anything of value of $5,000.00 in light of the effect that BCBS-AL's coverage of OIVIT would have on insurance premiums paid by the Alabama state government to BCBS-AL to obtain health insurance for state employees;

b.     Causing other members of the Alabama Legislature for the purpose of causing those legislators to take official action beneficial to Trina Health and its affiliated entities on the following questions, matters, proceedings, or controversies, with each involving the

20

business of a government agency involving things of value of more than $5,000.00: (1) the question of whether a bill would be introduced in the Alabama House of Representatives that would have the effect of requiring BCBS-AL to cover OIVIT; (2) the question of whether a bill having the effect of requiring BCBS-AL to cover OIVIT would be assigned to a committee wherein such bill would receive favorable treatment; and (3) the question of whether the Alabama House of Representatives Commerce and Small Business Committee would vote to advance a bill having the effect of requiring BCBS-AL to cover OIVIT.

## MANNER AND MEANS

82.     It was part of the conspiracy that Defendant Gilbert, personally and through Trina Health and its affiliated entities, would and did give things of value to Representative Hammon. Gilbert's giving of things of value consisted of: (1) in or about February of 2015, making Hammon a first-level seller of territorial rights to open Trina Health-affiliated clinics within designated geographic areas, thus allowing Hammon to receive finder's fees for selling territorial rights to second-level investors; (2) in or about February of 2015, Gilbert personally intervening with a creditor of Hammon on Hammon's behalf asking that the creditor allow Hammon additional time to repay an unpaid loan; (3) on or about April 7, 2016, Gilbert, through Trina Health, making a payment to Hammon in the amount of $2,000; and (4) on or about May 12, 2016, Gilbert personally informing the creditor of Hammon's that Trina Health was willing to repay Hammon's outstanding debt obligation.

83.     It was part of the conspiracy that Defendant Gilbert, personally and through Trina Health and its affiliated entities, would and did give things of value to Defendant-Representative Davis. Gilbert's giving of things of value consisted of: in or about February of 2015, making Davis a first-level seller of territorial rights to open Trina Health-affiliated clinics within designated geographic areas, thus allowing Davis to receive finder's fees for selling territorial

21

rights to second-level investors.

84.　　It was part of the conspiracy that, in anticipation of receiving gratuities from Defendant Gilbert and in return for receiving bribes from Gilbert, Representative Hammon would and did use his influence as a legislator to cause other legislators—including Defendant-Representative Davis, Representative Williams, State Senator A, and State Representative A—to advise and pressure BCBS-AL to: (1) drop the demands for repayment made to the health care providers employed by the Foley and Fairhope Trina Health-affiliated clinics; and (2) voluntarily begin reimbursing for OIVIT, including the Artificial Pancreas Treatment offered at Trina Health-affiliated clinics.

85.　　It was part of the conspiracy that, in anticipation of receiving gratuities from Defendant Gilbert and in return for receiving bribes from Gilbert, Defendant-Representative Davis would and did advise and pressure BCBS-AL to: (1) drop the demands for repayment made to the health care providers employed by the Foley and Fairhope Trina Health-affiliated clinics; and (2) voluntarily begin reimbursing for OIVIT, including the Artificial Pancreas Treatment offered at Trina Health-affiliated clinics.

86.　　It was part of the conspiracy that, in anticipation of receiving gratuities from Defendant Gilbert and in return for receiving bribes from Gilbert, Defendant-Representative Davis would and did use his influence as a legislator to cause other legislators—including State Representative C—to advise and pressure BCBS-AL to: (1) drop the demands for repayment made to the health care providers employed by the Foley and Fairhope Trina Health-affiliated clinics; and (2) voluntarily begin reimbursing for OIVIT, including the Artificial Pancreas Treatment offered at Trina Health-affiliated clinics.

87.　　It was part of the conspiracy that, knowing that Representative Hammon

22

anticipated to receive and had received things of value from Defendant Gilbert, Trina Health, and Trina Health-affiliated entities, and with a purpose of aiding Hammon to obtain things of value from Gilbert, Trina Health, and Trina Health-affiliated entities, Defendant-Representative Davis would and did advise and pressure BCBS-AL to: (1) drop the demands for repayment made to the health care providers employed by the Foley and Fairhope Trina Health-affiliated clinics; and (2) voluntarily begin reimbursing for OIVIT, including the Artificial Pancreas Treatment offered at Trina Health-affiliated clinics.

88. It was part of the conspiracy that, in or about February of 2016, when BCBS-AL declined to voluntarily begin reimbursing for OIVIT, such as the Artificial Pancreas Therapy offered at Trina Health-affiliated clinics, Defendant Gilbert would and did seek to introduce a bill in the Alabama House of Representatives that would have an effect of requiring BCBS-AL to cover OIVIT. Gilbert would and did intend to use the bill to accomplish the objective of obtaining coverage for the Artificial Pancreas Treatment in either of two possible ways: (1) the Alabama Legislature would pass the bill and the Governor would then sign it, thus creating a statutory mandate that BCSB-AL cover the Artificial Pancreas Treatment; or (2) through the holding of a public hearing on it, the bill would generate significant negative publicity for BCBS-AL, thus causing BCBS-AL to voluntarily cover OIVIT, including the Artificial Pancreas Treatment offered at Trina Health-affiliated clinics.

89. It was part of the conspiracy that Defendant Gilbert would and did attempt to corruptly influence Representative Hammon in connection with any business, transaction, or series of transactions of the state of Alabama involving anything of value of $5,000 or more, that is, to act so as to advance the bill supported by Trina Health.

90. It was part of the conspiracy that Defendant-Lobbyist Connors would and did

23

Gilbert.  From Gilbert and Representative Hammon, Connors would and did learn that Gilbert

had given and would give things of value to Hammon and to Defendant-Representative Davis to

corruptly influence those legislators.  Based on this knowledge and at Gilbert's direction,

Connors would and did attempt to to corruptly influence Hammon in connection with a series of

transactions of the state of Alabama involving anything of value of $5,000 or more.

91.     It was part of the conspiracy that Defendant-Representative Davis, because

Defendant Gilbert had given and would give things of value to Davis and to Representative

Hammon, would and did take the following official actions: (1) advising and pressuring another

member of the Alabama House of Representatives—State Representative B—to amend a

previously introduced bill to add to the bill a provision that would have the effect of requiring

BCBS-AL to cover OIVIT; (2) testifying before the Commerce and Small Business Committee

in support of a stand-alone bill that would have the effect of requiring BCBS-AL to cover

OIVIT; and (3) advising and pressuring other members of the Alabama House of Representatives

to support such a bill.

92.     It was part of the conspiracy that Defendant Gilbert would and did seek to conceal

Representative Hammon's efforts to assist Trina Health in causing BCBS-AL to cover OIVIT.

To do so, Gilbert would and did refer to Hammon by the alias name "Bill Johnson" in written

communications and in all telephonic conversations involving third parties.

### OVERT ACTS

93.     In furtherance of the conspiracy, Defendant Gilbert, Defendant-Lobbyist Connors,

and Defendant-Representative Davis, along with Representative Hammon and Representative

24

Williams, THCP Bham CEO C.B., CP Homes CEO T.G., CP Homes COO A.H., and others committed one or more of the following overt acts.

**A.   February through September of 2015: Gilbert Recruits  Hammon and Davis to Assist in a Lobbying Campaign Against BCBS-AL**

94.     In or about February of 2015, Defendant Gilbert agreed to make Representative Hammon and Defendant-Representative Davis resellers of territorial rights for Trina Health-affiliated clinics. As such, Hammon and Davis had opportunities to receive finder's fees from the proceeds of any sales of territorial rights to open Trina Health-affiliated clinics.

95.     On or about August 12, 2015, A.H., the COO of CP Homes, emailed Defendant Gilbert. In that email, A.H. informed Gilbert that CP Homes was "ready to launch [a] PR campaign" against BCBS-AL's decision to not cover OIVIT.

96.     In or about August of 2015, on a conference telephone call, Defendant Gilbert informed Representative Hammon, THCP Bham CEO C.B., and the Hoover clinic's financial backers of BCBS-AL's requests for refunds from the health care providers employed by the Trina Health-affiliated clinics in southern Alabama and BCBS-AL's draft policy statement denying coverage of OIVIT. Gilbert assured the listeners that he would be able to persuade BCBS-AL to reconsider its position regarding coverage of OIVIT. Based on Gilbert's assurances, Hammon, C.B., and the investors decided to proceed with plans to open the Hoover clinic in September of 2015.

97.     Soon after that conference telephone call, Representative Hammon contacted Defendant-Representative Davis and informed him of the billing dispute between BCBS-AL and the Foley and Fairhope Trina Health-affiliated clinics. Davis assured Hammon that he would do anything that he could to help Trina Health in persuading BCBS-AL to reconsider its position regarding coverage of OIVIT.

98.     On or about September 3, 2015, CP Homes COO A.H. met with Defendant-Representative Davis regarding the coverage dispute with BCBS-AL.  The following day, A.H emailed Defendant Gilbert, writing, "Met with State Rep Randy Davis, who has taken very strong interest in APT clinics since opening, offered unsolicited help.  Potential conference call with BCBS government representative in Montgomery next week, will invite Ford . . . .  Follow up actions . . . . Letters to state agency, BCBS, elected officials."

**B.      September of 2015: Hammon Sells His Interest in THCP Bham So As to Distance Himself Publicly From Gilbert's Lobbying Effort**

99.     As Trina Health and its associates began to plan a lobbying effort, Representative Hammon sought to distance himself from THCP Bham and Trina Health.  To that end, in or about September of 2015, Hammon sold two percent of his ownership interest in THCP Bham to an investor from Albertville, Alabama.  For that two percent interest, Hammon received a payment of $35,320.00.

100.    On or about September 22, 2015, Representative Hammon deposited a cashier's check payable in that amount into his personal bank account.  The check was drawn on THCP Bham's Wells Fargo bank account.  After the transaction, Hammon had a smaller interest in the Hoover Trina Health-affiliated clinic.  However, the level of Hammon's day-to-day involvement in the clinic's operations and the intensity of Hammon's efforts to secure for Trina Health a favorable resolution of the coverage dispute with BCBS-AL remained unchanged after the transaction.

**C.      September 15, 2015: THCP Bham's Hoover Trina Health-affiliated Clinic Opens**

101.    On or about September 15, 2015, the Hoover Trina Health-affiliated clinic held a grand opening ceremony.  At the request of Representative Hammon, the Governor of Alabama, Robert Bentley, attended the ceremony.  Also in attendance were Hammon, THCP Bham CEO

C.B., Defendant Gilbert, and CP Homes COO A.H.  Due to Governor Bentley's attendance, the

event received significant local media attention.

102.    On or about September 16, 2015, CP Homes COO A.H. sent an email to CP

Homes CEO T.G.  A.H. wrote the following:

> Hi [T.G.],
>
> Here are the updates for the trip in past two days:
>
> 1. Open house on Tuesday got great media coverage basically because governor
> was there . . . .
>
> . . . .
>
> 3. Birmingham has 3 major owners: Micky Hammon (leader of majority party),
> [C.B.] and [M.K.] . . . .  I spoke to all three of them and introduced myself and CP
> Homes. . . .  All three of them are aware of BCBS issue and are optimistic about it.
>
> . . . .
>
> 4. I had a meeting with Micky and [Trina Health COO T.M.] about BCBS.  Micky
> reassured that he had Randy Davis (whip of majority party) work on it and we
> should keep contacting Randy about the progress.  Micky will also bring in his
> friends (congressmen…etc.) who carry BCBS to treat for more leverage force.  He
> did not worry about the issue and confident that it will be solved.  However, he
> couldn't provide a timeline when can we expect it to be done.  His strategy is
> leaning towards "making friends" with BCBS.
>
> . . . .
>
> [A.H.]

**D.    October and November 2015: Hammon and Davis Assist with Efforts to Lobby
BCBS-AL**

103.    During in or about September of 2015, CP Homes continued to prepare a public

relations campaign against BCBS-AL.  During that time, at the direction of CP Homes officials,

Defendant-Representative Davis, in coordination with CP Homes officials, contacted various

officials of BCBS-AL.

104.    On or about October 1, 2015, CP Homes, on behalf of the Trina Health-affiliated clinics in Foley and Fairhope, issued a press release.  The press release stated, "BLUE CROSS BLUE SHIELD OF ALABAMA DENIES LIFE-CHANGING COVERAGE TO DIABETICS Largest insurance provider in state of Alabama denies claims and retroactively bills for previously approved claims."  Defendant Gilbert and Defendant-Representative Davis, along with Representative Hammon, personally received this press release.  When he received it, Hammon sent an email to TCHP Bham CEO C.B.  Hammon's email read: "Perfect!!!"

105.    In or about October of 2015, Representative Hammon contacted State Senator A. Hammon asked State Senator A to contact BCBS-AL and ask BCBS-AL to consider covering the treatments offered by the Trina Health-affiliated clinics.  On or about October 7, 2015, at Hammon's request, State Senator A contacted BCBS-AL Lobbyist A regarding Trina Health.

106.    On or about October 19, 2015, CP Homes COO A.H. sent an email to Defendant Gilbert, reporting that BCBS-AL officials had sent letters to the Foley and Fairhope Trina Health-affiliated clinics.  In those letters, the BCBS-AL officials had not appeared willing to work with CP Homes to find an amicable resolution to the coverage dispute.  She asked, "Should we send these to Randy Davis?"

107.    Also on or about October 19, 2015, CP Homes Public Relations Manager A.B. sent an email to Defendant-Representative Davis.  In that email, A.B. informed Davis that CP Homes was about to start a public relations campaign against BCBS-AL.  She acknowledged that Davis was "in the midst of discussions with Blue Cross Blue Shield of Alabama in an effort to set a meeting with the president and other decision makers."  On or about the following day, Davis responded to A.B.  He wrote that the public relations campaign had surprised him.  Davis instructed, "Please in the future when I am intervening on your behalf that you make me aware."

28

108.    In or about October of 2015, Defendant Gilbert unveiled a public relations and lobbying campaign against BCBS-AL of his own. He dubbed the campaign "BlueGate, the Committee Against BCBS Abuses." Components of the BlueGate plan included: (1) launching a public opinion campaign; (2) filing a complaint in the Circuit Court of Baldwin County alleging state law tort claims; (3) filing a complaint in a federal court alleging claims under the Racketeer Influenced and Corrupt Organizations Act and the Employee Retirement Income Security Act; (4) obtaining the support of unions and other labor organizations, including the Alabama Education Association; and (5) advocating for the enactment of a state law that would require BCBS-AL to cover the Artificial Pancreas Treatment. In light of the lobbying goal and the public scrutiny that would follow if Representative Hammon were linked to a legislative effort designed to benefit a company with which he was associated, Hammon asked that Gilbert refrain from publicly linking him (Hammon) with BlueGate. Gilbert agreed to do so. Thereafter, Gilbert began referring to Hammon by the alias name "Bill Johnson" in written and oral communications relating to Trina Health and its dispute with BCBS-AL.

109.    On or about October 27, 2015, Defendant Gilbert disseminated by email to various individuals, including THCP Bham CEO C.B., a strategy memorandum detailing his goals for the BlueGate campaign. In that email, Gilbert wrote that he was not sending the email to "Bill Johnson," and he asked C.B. to do so. Thereafter, C.B. forwarded the email to Representative Hammon. Hammon then forwarded it to Defendant-Representative Davis.

110.    In or about November of 2015, Representative Hammon persuaded State Representative A, himself a diabetic, to visit the Trina Health-affiliated clinic in Fairhope for a consultation. During that consultation, the health care provider at the clinic reported that State Representative A was a candidate for the Artificial Pancreas Treatment. State Representative A

then agreed to accept a publicly available offer of four free treatment sessions in exchange for

signing a petition requesting that BCBS-AL start covering OIVIT like the Artificial Pancreas

Treatment. Thereafter, the administrator of the Fairhope Trina Health-affiliated clinic sent an

email to CPH Homes COO A.H. In that email, the administrator reported that State

Representative A was "willing to take on the fight for us." Subsequently, that email was

forwarded to Hammon and to Defendant-Representative Davis. When Davis received the email,

he responded, "Let's keep working. Randy Davis."

**E.   November of 2015: Trina Health and BCBS-AL Medical Policy Officials Meet**

111.   During in or about November of 2015, Defendant Gilbert exchanged a series of

emails with BCBS-AL administrative personnel regarding the scheduling of a meeting between

Trina Health representatives and the Medical Policy office of BCBS-AL. In those emails, the

parties ultimately agreed to meet on November 30, 2015. Gilbert, THCP Bham CEO C.B., and

others forwarded many of those emails to Representative Hammon and Defendant-

Representative Davis. For example, on or about November 10, 2015, Gilbert forwarded to C.B.

a copy of an email he received from a BCBS-AL administrative assistant. Gilbert blind carbon

copied Hammon on the forwarded email. In the text, Gilbert wrote, "Dear bill  G. Ford Gilbert."

112.   On or about November 10, 2015, Defendant Gilbert sent an email to Defendant-

Representative Davis. In that email, Gilbert wrote,

Dear Randy,

I am sure you recall our meetings. I was so thankful and impressed that you are
such an active part of the State's system to protect Alabamans. (I still call myself
a "Son of the City of the Vulcan"). I know that you have seen some of the successes
of normalizing metabolism, and now we see successes in some stroke and dementia
patients.

We want to be the good people here. We want to have a win-win with BCBS, but
they are not being proper. Other Blue Cross Blue Shield continue to pay (after

being ordered by Court), and even that was not interesting to them.

. . . .

The Committee has come up with the list of items, and put Nov. 12 as the launch date. This is because we were to work with BCBS. But they showed their colors again, by saying "come present on Nov. 30, but we don't think it has anything to do with asking the doctors for money." If they were proper people, they would have said "come present, and we will see if this is good." But they did not.

So, I invite you to call me, day or night, to work with Alabamans (present and away), to do what needs to be done. My cell : . . . . The nice thing is that you can tell me anything and it will not go farther than you direct, and cannot be pried out of me . . . [ellipses in original] that way we don't have to worry about being misunderstood.

Thank you for your service to our people.

G. Ford Gilbert

113.     On or about November 12, 2015, Defendant-Representative Davis replied to Defendant Gilbert's November 10, 2015 email, writing "I have worked a bit behind the scenes to determine what your next step might be." Davis then asked whether Gilbert planned to simultaneously proceed with the November 30 meeting with BCBS-AL and the BlueGate campaign. Later that day, Gilbert replied that he planned to "file one or two actions, make sure BlueGate is in full swing and then show them the money we will save." Gilbert thanked Davis for Davis's help. Later that day, Davis replied, "Glad to help. We need this program moving again."

114.     On or about November of 2015, Defendant-Representative Davis contacted State Representative C regarding Trina Health's dispute with BCBS-AL. Davis asked State Representative C to contact BCBS-AL and see if BCBS-AL would consider reversing its position regarding coverage of OIVIT. Aware of Representative Hammon's previous involvement with BCBS-AL and Davis's close relationship with Hammon, State Representative

31

C asked Davis whether Davis was acting for the purpose of benefitting Hammon. Davis replied that he was motivated only by a desire to help the diabetic patients who resided in his legislative district.

115.    On or about November 12, 2015, Defendant Gilbert sent a sharply worded email to a physician employed by the Medical Policy office of BCBS-AL. In that email, Gilbert accused the physician of being biased against Trina Health. Gilbert blind carbon copied Representative Hammon and Defendant-Representative Davis. Thereafter, Davis emailed Hammon. In that email, he referred to Gilbert as "aggressive and rude." He went on to write that he "had [State Representative C] willing to listen" before Gilbert sent the above-described email to the BCBS-AL physician.

116.    In or about November of 2015, Representative Hammon recommended to Defendant Gilbert that Trina Health retain a lobbyist to assist in the upcoming meeting with BCBS-AL. Hammon recommended a good friend of his, Lobbyist B. Thereafter, Gilbert persuaded CP Homes CEO T.G. that CP Homes should hire Lobbyist B. T.G. agreed to do so.

117.    On or about November 30, 2015, at the office of Lobbyist B, a meeting of individuals affiliated with Trina Health occurred. Attending that meeting were: Representative Hammon, Lobbyist B, CP Homes CEO T.G., THCP Bham CEO C.B., some of the investors in THCP Bham, and Defendant Gilbert. During that meeting, they strategized regarding the meeting with BCBS-AL's Medical Policy officials, which was to occur later that day.

118.    Later on or about November 30, 2015, on the Hoover campus of BCBS-AL's corporate headquarters, almost all of the above-described individuals met with BCBS-AL officials. Representative Hammon did not attend the meeting, nor was his affiliation with Trina Health mentioned during the meeting.

32

119.    After the meeting, on or about December 6, 2015, CP Homes CEO T.G.

organized a conference telephone call to occur that day for the purpose of discussing "the BCBS

status." He invited to the call Defendant Gilbert, CP Homes COO A.H., Lobbyist B, and THCP

Bham CEO C.B. After T.G. sent the email inviting those individuals to the conference telephone

call, Gilbert responded, "I assume you want . . . Bill Johnson, whom I copy here." Gilbert blind

carbon copied Representative Hammon on the reply.

## F.    January and February of 2016: BCBS-AL Denies Trina Health's Appeal of the Medical Policy Decision Not to Cover OIVIT

120.    On or about January 15, 2016, APT Fairhope (the subsidiary of CP Homes

operating the Fairhope Trina Health-affiliated clinic) issued two checks payable to BCBS-AL.

The checks were to cover the refunds that BCBS-AL requested in July of 2015 that the Fairhope

clinic's health care providers pay. One check was in the amount of $1,080.56; the other was in

the amount of $19,498.71. Also on or about that date, APT Foley (the subsidiary of CP Homes

operating the Foley Trina Health-affiliated clinic) issued two checks payable to BCBS-AL. The

checks were to cover the refunds that BCBS-AL requested in July of 2015 that the Foley clinic's

health care providers pay. One check was in the amount of $3,404.81; the other was in the

amount of $17,801.52. The payment of these refunds ended the health care providers' appeal of

the refund request made by the Network Integrity officials at BCBS-AL. However, at that time,

Trina Health was still awaiting BCBS-AL's final decision on its appeal of the Medical Policy

office's decision not to cover, going forward, OIVIT.

121.    When Defendant Gilbert learned that the CP Homes subsidiaries had paid the

health care providers' debts, he sent an email to CP Homes COO A.H. In that email, Gilbert

wrote, "I'm glad we did this thing with the Doctors, I am going to rub it in where it really hurts."

He also stated that he was ready to "pull the trigger."

122.     On or about February 5, 2016, Defendant Gilbert sent an email to a BCBS-AL official.  In that email, Gilbert accused BCBS-AL of having wrongly decided to deny coverage for OIVIT.  Gilbert wrote, "The Trina treatment is uniformly results in wonderful outcomes for the patient."  Gilbert blind carbon copied Representative Hammon.

123.     On or about February 17, 2016, Defendant Gilbert received from BCBS-AL its formal decision denying Trina Health's appeal of the Medical Policy decision to not cover OIVIT.  Thereafter, Gilbert drafted a letter he intended to send to BCBS-AL in response to its denial of the appeal.  On or about February 20, 2016, Gilbert sent by email a copy of that draft letter to Representative Hammon.  Gilbert wrote that he hoped that the draft letter would "go well with a jury."  Later on or about that day, Hammon responded to Gilbert and suggested that Gilbert work into his letter an allegation that, by denying coverage for OIVIT, BCBS-AL was contravening its slogan, which was "We cover what matters."  Thereafter, on or about February 20, 2016, Gilbert sent to CP Homes CEO T.G., CP Homes COO A.H., THCP Bham CEO C.B., and others, a revised draft of the letter to BCBS-AL.  In the email to which Gilbert attached the draft, Gilbert wrote, "Bill Johnson had the tag line of BCBSAL which is we cover what matters, so I played on that."  Gilbert blind carbon copied Hammon on that last email.

## G.     February of 2016: Gilbert Intervenes For Hammon with Hammon's Creditors

124.     In or about March of 2015, an Alabama state court entered a consent judgment ordering Representative Hammon to pay to Regions unpaid principal and interest on an overdue loan.  The state court ordered Hammon to pay approximately $245,000.00.  The judgment permitted Hammon to make monthly payments of approximately $1,000 for a period of 12 months.  After that 12-month period, Hammon was obligated to repay the remaining unpaid amount.

34

125.    By in or about February of 2016, Representative Hammon still owed

approximately $241,846.28. Under the judgment, Hammon had only one month to pay the full

amount. Sometime in or about February of 2016, Hammon informed Defendant Gilbert that he

would be unable to pay the full amount, which was due in March of 2016.

126.    On or about February 1, 2016, Representative Hammon sent an email to

Defendant Gilbert informing Gilbert of the identity of Regions Attorney A, the attorney retained

by Regions to negotiate the collection of the outstanding debt. In that email, Hammon wrote,

"Thanks for your help Ford."

127.    On or about February 13, 2016, Defendant Gilbert sent an email to Regions

Attorney A. In that email, Gilbert wrote:

> Dear [Attorney A]:
>
> I know from trying to catch you in, you are exceedingly busy. Therefore I will
> make this email concise.
>
> Micky Hammon has been working on the massive diabetes problem of Alabama
> for over a year. Through his funding and associates, he was able to get our company
> to open 3 clinics in Alabama, (Hoover, Fairhope and Foley).
>
> The goal of course was to help the people of Alabama and use funds to pay off the
> debt to your bank. Everything was going exceedingly well, governor Bentley was
> at the clinic opening ceremony cutting the red ribbon, and it never occurred to us
> that Blue Cross Blue Shield of Alabama would refuse to pay for the treatment since
> other BSBC [sic] in all our other states always pay for the treatment. In fact, in
> California there was a lawsuit over payment, and Blue Cross Blue Shield, Aetna,
> and a number of other insurance companies were all ordered to pay including the
> massive CalPers (State of California).
>
> This has been a setback but, but not a knockout blow since Medicare is still paying.
> However, since Blue Cross Blue Shield of Alabama has a virtual monopoly of 85%
> insurance coverage, the other clinics are not opening until BCBSAL starts to pay.
> Since the treatment is so effective, it should not be long before this matter is decided
> favorably.
>
> . . . .

35

Please allow me to facilitate payment that is helpful to all.  I'm sorry that I missed you again, and apparently Mr. Hammon has called and not gotten through due to your busy schedule.  He remains available to confirm that it is appropriate to talk with me.

Very truly yours.

G Ford Gilbert, JD PhD
Trina Health

Gilbert blind carbon copied Representative Hammon.  On or about the following day, Hammon sent an email to Gilbert.  In that email, he wrote, "Great letter.  Thank you Ford."

128.    On or about February 17, 2016, Defendant Gilbert participated in a telephone call with Regions Attorney A.  During that conversation, Gilbert told Attorney A that he (Gilbert) and Representative Hammon were trying to open diabetes treatment clinics in Alabama and that Hammon stood to receive a significant amount of money when new clinics opened.  Gilbert encouraged Attorney A to allow Hammon more time to repay the loan.

129.    Later on or about February 17, 2016, Defendant Gilbert sent an email to Regions Attorney A.  In that email, Gilbert thanked Attorney A for "listening to [Gilbert's] life's story and how that affected Mr. Hammon."  Gilbert concluded the letter by writing, "I look forward to completing the plans we started with Micky Hammon."

130.    On or about March 1, 2016, Defendant Gilbert sent another email to Regions Attorney A.  In that email, Gilbert appeared to offer that Trina Health would repay Representative Hammon's debt.  Gilbert wrote that he was "ready to write the instructions from the Bank to Trina Health for Trina to pay the Bank first, with an ongoing payment plan at the same time."

131.    Throughout this period, during private conversations, Defendant Gilbert assured Representative Hammon that, as soon as Trina Health or Gilbert had sufficient funds, payment of

36

Hammon's debt to Regions would be made.  Hammon understood this promise to be related to

Gilbert's efforts to persuade Hammon to facilitate the enactment of a bill that would effectively

require BCBS-AL to cover the Artificial Pancreas Treatment.

132.    Subsequently, Regions granted Representative Hammon an extension of an

unspecified length to repay the loan.

## H.    February of 2016: Gilbert Prepares to Have a Bill Introduced in the Alabama Legislature and Hires Connors

133.    By in or about February of 2016, Defendant Gilbert was preparing to pursue the

introduction of a bill in the Alabama Legislature that would require BCBS-AL to cover the

Artificial Pancreas Treatment.  Gilbert asked Representative Hammon to sponsor such a bill, but

Hammon refused.

134.    In or about February of 2016, in an email, CP Homes COO A.H. asked Lobbyist

B to draft such a bill "for Mr. Johnson."  However, Lobbyist B declined to do so, citing a conflict

of interest between his firm and BCBS-AL.  Thereafter, Lobbyist B withdrew from representing

Trina Health.

135.    At Lobbyist B's recommendation, CP Homes subsequently retained Defendant-

Lobbyist Connors to lobby for the enactment of a bill requiring BCBS-AL to cover Artificial

Pancreas Treatment.  CP Homes T.G., CP Homes COO A.H., and the other officials at CP

Homes instructed Connors that he could work under the direction of Gilbert.

136.    On or about February 25, 2016, Defendant Gilbert sent an email to CP Homes

CEO T.G. and CP Homes COO A.H.  In that email, he wrote, "Dear [T.G.] and [A.H.]: You will

love our new lobbyist. He is already at work even though he is on the steering committee for the

local Senator. His name is Marty Connors . . . . Let me put a conference call together."  Gilbert

blind carbon copied Representative Hammon.

37

137.    In or about February of 2016, Defendant-Representative Davis met with
Representative Williams and asked Williams to support a bill that would require health insurance
companies operating in Alabama to cover the Artificial Pancreas Treatment. Williams
understood that such a bill would almost singularly benefit a company in which Representative
Hammon had a financial interest. In part as a favor to Hammon, Williams agreed to support
such a bill.

138.    On or about February 26, 2016, Defendant Gilbert, Representative Williams, and
THCP Bham CEO C.B. met for dinner at a Birmingham restaurant. During that dinner, the
group discussed the bill that Gilbert wanted introduced and enacted. Williams informed Gilbert
that he (Williams) would ensure that the bill was assigned to the committee he chaired, the
Commerce and Small Business Committee. Williams further promised that, once the bill was
assigned to his committee, Williams would hold a hearing on the bill. Williams hoped that the
holding of a hearing would cause BCBS-AL to negotiate with Trina Health. After the dinner,
Williams contacted Hammon and informed Hammon of his (Williams's) plan to assist Trina
Health and Hammon in the upcoming legislative effort.

139.    On or about February 29, 2016, CP Homes COO A.H. sent a signed consulting
agreement to Defendant-Lobbyist Connors. In the email to which the agreement was attached,
A.H. asked that Connors maintain complete confidentiality. However, Connors was permitted to
share information with Defendant Gilbert.

**I.    March of 2016: Gilbert Drafts a Bill and Has it Introduced**

140.    On or about March 1, 2016, Defendant-Lobbyist Connors sent an email to
Defendant Gilbert and CP Homes CEO T.G. The subject line of the email was "Something to
watch (HB 86)." In that email, Connors wrote, "Rep. Randy Davis learned of [State

38

Representative B] who is fighting a similar issue with BCBS on cancer drugs with a specific bill HB86. I've asked Randy if he will ask [State Representative B] to include us. [The Chairman of the Insurance Committee] has not brought it up in House Insurance yet. Just one of a number of suggestions."

141.    Later on or about March 1, 2016, Defendant Gilbert sent a response to Defendant-Lobbyist Connors. In that response, he wrote, "I think I should try to weave in the Trina treatment. As soon as I am able, I will send my weave." Also on or about March 1, 2016, Connors replied, "Yes, had a strategic chat with Majority Leader tonight before I got to the Senator Shelby event. Will update in detail but basically we'll need language for a second bill to H86 to be assigned to a different committee, hopefully Commerce (Williams). I'll and the Leader will be back with Randy Davis regarding amendments to [State Representative B's] HB 86."

142.    On or about March 5, 2016, Defendant Gilbert sent an email to Defendant-Lobbyist Connors. The subject line was "Modified HB86." Attached to the email was a revised version of House Bill (H.B.) 86 that included references to OIVIT. Gilbert had written the revised draft bill. The draft bill would have had the effect of requiring BCBS-AL to cover OIVIT. In the email attached to the bill, Gilbert wrote that the bill "belongs in Commerce as it is to save money for both the benefits provider and the patient." Gilbert blind carbon copied Representative Hammon.

143.    Approximately five minutes later, also on or about March 5, 2016, Defendant-Lobbyist Connors forwarded Defendant Gilbert's email containing the draft bill to Defendant-Representative Davis and to Representative Williams.

144.    Subsequently, Defendant-Representative Davis asked State Representative B

whether State Representative B would be willing to amend the existing bill, H.B. 86, so that H.B. 86 would have the effect of requiring BCBS-AL to cover OIVIT like the Artificial Pancreas Treatment. State Representative B responded that the proponents of H.B. 86 were unwilling to support an amendment. However, State Representative B offered to Davis that he would be willing to sponsor a stand-alone bill backed by Trina Health.

145.   On or about March 8, 2016, Defendant Gilbert sent an email to CP Homes CEO T.G. and CP Homes COO A.H. In that email, Gilbert discussed a meeting he had just had with Lobbyist C. Representative Hammon had placed Lobbyist C in contact with Gilbert. During the meeting, Gilbert and Lobbyist C had discussed a plan to introduce a separate bill that would have the effect of disbanding BCBS-AL. Gilbert speculated to T.G. and A.H. that the threat of a bill to disband BCBS-AL might cause BCBS-AL to not oppose a bill to require BCBS-AL to cover OIVIT. According to Gilbert, Defendant-Representative Davis might be willing to sponsor the bill to disband BCBS-AL. In the email Gilbert wrote that Lobbyist C did not realize that "Mickey and Randy Davis with Jack Williams could deliver the entire house."

146.   In or about early March of 2016, Defendant-Lobbyist Connors asked Representative Hammon to authorize him (Connors) to submit Defendant Gilbert's draft bill to the LRS for the purposes of formatting the bill for introduction on the floor of the Alabama House of Representatives. Hammon reminded Connors that it would be unlawful for him to have overt involvement in the legislative process and that authorizing Connors to submit the draft to the LRS on Hammon's behalf would be considered overt involvement. Hammon suggested that Connors obtain Representative Williams's authorization to submit the draft bill on Williams's behalf. Subsequently, at Hammon's direction, Connors asked Williams for authorization to submit the draft bill on Williams's behalf. Williams agreed and contacted the

40

LRS to inform the staff that Connors had his (Williams's) authority to submit draft bills on Williams's behalf.

147.    On or about March 9, 2016, Defendant Gilbert sent to Defendant-Lobbyist Connors an email. The subject line of the email was "here is HB xxx (number to be assigned). In that email, Gilbert wrote, "I hope this seems as proper to you as it does to me. Ford." Attached to the email was a draft bill written by Gilbert that would have had the effect of requiring BCBS-AL to cover OIVIT like the Artificial Pancreas Treatment. The bill would have done so by adding, among others, the following provision to the Code of Alabama:

> A health benefit plan that covers intravenous insulin infusion by a health care provider in a hospital, must cover intravenous insulin infusion by a health care provider in a clinic, and may not require a higher copayment, deductible, or coinsurance amount for intravenous insulin infusion in a clinic, regardless of the formulation or benefit category specified in the health benefit plan.

This provision would have had the effect of requiring BCBS-AL to cover OIVIT because inpatient intravenous insulin infusion was recognized as a medically necessary treatment in the hospital setting and, therefore, was a standard part of most benefit plans. Therefore, under the terms of the bill, for BCBS-AL to continue to cover inpatient intravenous insulin infusion, BCBS-AL would have been required to also start covering OIVIT, like the Artificial Pancreas Treatment. Gilbert blind carbon copied Representative Hammon and Defendant-Representative Davis on the email sending the draft bill.

148.    On or about March 9, 2016, Defendant-Lobbyist Connors sent an email to an employee of the LRS. In that email, Connors wrote, "Under the permission of Rep. Jack Williams (Vestavia) please draft the following legislation awaiting signature of [State Representative B] and/or others." Attached to the email was the draft bill prepared by Defendant Gilbert.

41

149. On or about March 11, 2016, A.B., the public relations manager for CP Homes, sent an email to Defendant Gilbert, CP Homes CEO T.G., CP Homes COO A.H., THCP Bham CEO C.B., and Representative Hammon. All recipients were visibly carbon copied on the email. The subject line of the email stated "Blue Gate Roll Out Strategy." In that email, A.B. listed various tasks to be performed related to a public relations campaign against BCBS-AL. Among those items was "Micky to obtain and share political email list, if possible." The following day, Defendant Gilbert emailed all of the recipients of A.B.'s email. In his email, Gilbert wrote, "I don't think that Rep. Hammon, being a sitting congressman should be part of this, or any emails as he is not involved." Less than one minute later, Gilbert sent another email to all of the recipients of A.B.'s email—except for Representative Hammon. In the second email, Gilbert wrote only, ":)," which was intended to represent a smiling face.

150. On or about March 15, 2016, State Representative B introduced the bill first drafted by Defendant Gilbert onto the floor of the Alabama House of Representatives. The legislation was assigned the number H.B. 415. Soon thereafter, Representative Williams approached a member of the staff of the Speaker of the Alabama House of Representatives. Williams asked the staff member to ensure that the Speaker assigned H.B. 415 to his committee, the Commerce and Small Business Committee. The staff member agreed to do so. Thereafter, the Speaker assigned H.B. 415 to the Commerce and Small Business Committee.

## J. Early April of 2016: Public Hearing on H.B. 415, During Which Davis Speaks In Support of the Bill

151. Soon after the bill arrived in Representative Williams's committee, lobbyists opposed to H.B. 415 filed official requests for a public hearing on the bill. Williams scheduled a public hearing on H.B. 415 for April 13, 2016.

152. On or about April 4, 2016, Defendant Gilbert emailed the health care providers

42

employed by the Trina Health-affiliated clinics in Foley and Fairhope.  In the email, he informed them of the date of the public hearing and asked that they attend.  Gilbert wrote that he hoped that the hearing would "be such a newsworthy event, that the bill will pass or at least Blue Cross Blue Shield of Alabama will recant."  Gilbert blind carbon copied Representative Hammon.

153.    On or about April 7, 2016, Defendant Gilbert, through an account controlled by Trina Health, wired and caused to be wired $2,000 into Representative Hammon's bank account.

154.    On or about April 11, 2016, Defendant Gilbert sent an email to Defendant-Lobbyist Connors, Representative Williams, Defendant-Representative Davis, and others.  In that email, Gilbert reported that he had come "straight from Mexico City" and was "already here in Alabama."  He stated that he was "working to get additional people to come" to the public hearing.  Gilbert blind carbon copied Representative Hammon.

155.    At some point on or before April 13, 2016, Defendant-Representative Davis contacted the office of the Clerk of the Alabama House of Representatives. Davis asked that an employee of that office attend the public hearing on H.B. 415 and video record the proceedings. The office agreed to send an employee to make such a recording.

156.    At some point on or before April 13, 2016, Representative Hammon contacted State Representative A and asked State Representative A if he would attend the public hearing on H.B. 415 and, during that hearing: (1) describe his experiences as a patient of the Trina Health-affiliated clinic in Fairhope; and (2) urge the members of the committee to support the bill.  State Representative A agreed to do so.

157.    At some point on or before April 13, 2016, Representative Hammon invited Defendant Gilbert to attend a weekly luncheon of the members of the Alabama House of Representatives majority party caucus. Subsequently, on or about an unknown date on or before

43

April 13, 2016, Gilbert attended such a luncheon. At the luncheon, Defendant-Representative

Davis introduced Gilbert as someone who was working to combat the diabetes problem in

Alabama.

158.    On or about April 13, 2016, Representative Williams presided over a public

hearing on H.B. 415. During that hearing, Defendant Gilbert, Defendant-Representative Davis,

and State Representative A testified in support of H.B. 415 and advised the members of the

committee to vote in favor of the bill. A physician employed by BCBS-AL spoke in opposition

to the bill. Also during the hearing, Representative Hammon stood in the hallway outside of the

committee's meeting room and tried to overhear the proceedings.

## K.    Late April of 2016: Gilbert and Connors Lobby Committee Members to Support H.B. 415

159.    On or about April 14, 2016, Defendant-Lobbyist Connors sent an email to

Defendant Gilbert, copying Defendant-Representative Davis and Representative Williams. In

that email, Connors stated that he had just spoken with Williams and that Williams had agreed to

have his staff person disseminate to the members of the committee a letter written by Gilbert and

promotional materials prepared by Gilbert.

160.    Later on or about April 14, 2016, Defendant-Lobbyist Connors sent an email to

M.D., a member of the staff of the Commerce and Small Business Committee. In that email, he

wrote, "As we just discussed and as Chairman Williams has authorized, can you distribute this to

the full Commerce Committee?" Attached to that email was the letter written by Defendant

Gilbert and the promotional materials prepared by Gilbert. Connors carbon copied

Representative Williams. Later that day, M.D. replied to Connors, "I have forwarded your email

with the attachments on to the Commerce and Small Business Committee Members."

Thereafter, on or about that day, Connors sent to Defendant-Representative Davis M.D.'s email

44

confirming the sending of the materials.  Davis then forwarded the email to Representative Hammon.

161.    On or about April 16, 2016, Defendant Gilbert emailed State Representative D, a member of the Commerce and Small Business Committee.  The purpose of the email was to encourage State Representative D to support H.B. 415.  Gilbert blind carbon copied Representative Hammon.

162.    On or about April 15, 2016, Defendant-Lobbyist Connors traveled out of the United States on a planned vacation.  Before leaving, Connors requested that Lobbyist D, a friend of his, lobby on behalf of Defendant Gilbert during Connors's absence.  Lobbyist D agreed to do so.

163.    On or about April 17, 2016, Lobbyist D filed documents with the Alabama Secretary of State registering himself as a lobbyist for Trina Health and CP Homes.  On that document, Lobbyist D listed Trina Health as a principal.  On or about April 17, 2016, Defendant Gilbert signed a document confirming that Trina Health was a principal and that Lobbyist D was its registered lobbyist.

164.    On or about April 18, 2016, Defendant Gilbert sent to Lobbyist D a statement supporting H.B. 415 written by Gilbert.  Gilbert wanted Lobbyist D to give the statement to State Representative B for State Representative B to read to the Commerce and Small Business Committee before the committee voted on H.B. 415.  Gilbert blind carbon copied Representative Hammon on the email.

165.    On or about April 19, 2016, the Commerce and Small Business Committee was scheduled to vote on H.B. 415.  However, shortly before the committee's meeting was to occur, Representative Williams pulled H.B. 415 from the agenda.

45

**L.      Late April and May of 2016: Gilbert Tries to Use the Threat of Legislative Action to Pressure BCBS to Reimburse for Outpatient Intravenous Insulin Injection Therapy**

166.     On or about April 22, 2016, Defendant Gilbert sent to Representative Hammon a draft of a letter Gilbert intended to send to BCBS-AL officials.  In that draft letter, Gilbert wrote that he had "necessary votes to get HB 415 out of committee."

167.     On or about April 30, 2016, Defendant Gilbert emailed Representative Williams. Gilbert wrote in the email, "Dear Chairman Williams: Attached is our formal letter as suggested. Please call me at your earliest convenience . . . . Thank you very much.  Ford."  Attached to the email was a letter to Williams.  At the top of the letter, Gilbert wrote that the letter was "For Transmission to, Blue Cross Blue Shield of Alabama (hand delivered)."  The subject of the letter was: "Potential Resolution."  In the letter, Gilbert wrote:

> Dear Chairman Williams:
>
> Thank you for your attempts to fashion a resolution to the problem of BCBSAL having misrepresented the facts and the efficiency of the Artificial Pancreas Treatment® to the House Committee.
>
> . . . .
>
> 3. Alabama Medical Doctors appealed, but were extorted by "Network Integrity" to stop their appeal.  Thus, there exist 3 items to resolve, a) the actions of BCBSAL to these doctors, b) the actions of BCBSAL as to denying coverage without a single case of failure and without review of the patients charts or all the clinical trials, and c) the statements to your Committee.
>
> 4. A proposal was submitted to your Committee for BCBSAL to allow high-user patients, and those facing amputations to be covered, and then have Board Certified UAB physicians verify that millions of dollars are saved (not to mention the restoration of health for these severely ill patients.)  To make this a financial win either way, the clinics offer to return 200% (double) the payments if any patient is hospitalized, or any patient's pending amputation goes forward.

. . .

6. The agreement and then presentation must take place by May 10th as I am a personal all aspect guest of the King of Saudi Arabia and his physicians to hold a large conference on the 19th. They have arranged this after visiting clinics and sending physicians to review what we do. It is sad that we get better treatment in Mexico, China, India, Taiwan, Canada, South Africa, and now Saudi Arabia than I do in my home state.

7. So, please offer this one last overture to BCBSAL to avoid the above 3 including RICO etc. by being proper scientists who seek only truth. We are the "good guys" and do not deserve the treatment we have received to date. It can be remedied easily, or not. The decision is entirely BCBSAL.

. . .

Sincerely yours,

G. Ford Gilbert, JD, PhD

On or about May 4, 2016, Williams forwarded Gilbert's April 30, 2016 email, with the attached letter, to BCBS-AL Lobbyist A.

168.    On or about May 7, 2016, Defendant Gilbert sent an email to BCBS-AL Lobbyist A. In that email, Gilbert wrote, "Chairman Williams asked that I communicate directly with you about a resolution." Gilbert then proposed that he and Lobbyist A engage in confidential negotiations. Gilbert concluded the letter by writing, "I will report to Rep. Jack Williams that I have suggested this more direct communication."

169.    When BCBS-AL Lobbyist A did not promptly respond to Defendant Gilbert's May 7, 2016 email, on or about May 9, 2016, Gilbert sent Lobbyist A a second email. In that second email, Gilbert noted that he was "under a major time restraint." Gilbert asked Lobbyist A to "please respond in some way to my prior email (of just 2 days ago) so that I can report to several people. The offer to work together must be accepted or rejected within the next few days." Subsequently, later on or about May 9, 2016, Lobbyist A replied to Gilbert. Lobbyist A

wrote that Representative Williams "asked that Blue Cross Blue Shield communicate directly with [Gilbert]." Lobbyist A then suggested that, going forward, Gilbert negotiate with BCBS-AL Attorney B.

170.   On or about May 11, 2016, BCBS-AL Attorney B sent a letter, as an attachment to an email, to Defendant Gilbert. The attorney wrote, "Chairman Jack Williams asked that we respond directly to you regarding your correspondence dated April 30, 2016. Please accept this as clarification of the facts." The attorney then explained why BCBS-AL would not cover OIVIT, like Artificial Pancreas Treatment. He stated, "Based on our extensive review, [Artificial Pancreas Treatment] remains non-covered due to lack of well-respected, published peer-reviewed clinical evidence and data to support improved net health outcomes." The attorney carbon copied Representative Williams and BCBS-AL Lobbyist A on the email.

171.   On or about May 11, 2016, Defendant Gilbert sent as an attachment to an email to Defendant-Lobbyist Connors, Lobbyist D, CP Homes CEO T.G. and others a draft of a letter he intended to send to the BCBS-AL attorney, BCBS-AL Attorney B. In the email preceding the draft, he wrote, "This is my draft letter. I am making it aggressive because it is to attorneys . . . . I would like to do a 'rolling thunder' approach . . . ." In the draft letter, Gilbert wrote, in part,

> This is not a reimbursement issue, this is an issue regarding an 'insurance company' which has lied to the House Committee, has extorted the submission of physicians, has ruled on medical issues when they said they wanted more information, has paid monstrous salaries and bonuses to executives . . . , has lobbied for legislation to cover up their inequities, and has established a one-person 'death panel' who then misled the House.

Gilbert blind carbon copied Representative Hammon. Subsequently, T.G. advised Gilbert to refrain from sending the letter. Gilbert then sent another email stating that he would not send the letter. In that second letter, he stated, "Mr. Johnson says that it is unusual for an invitation to [Attorney B] to take place. So I will call him and take his temperature, say nothing specific and

report back."

172.    On or about May 12, 2016, Defendant Gilbert sent to Defendant-Lobbyist

Connors and Lobbyist D an email.  He blind carbon copied Representative Hammon.  In the

email, Gilbert informed Connors that "Mr. Johnson" was also receiving the email.  Gilbert then

wrote, "I don't think I've ever wanted to be more vindictive than I want to be with Blue Cross

Blue Shield Alabama."

173.    On or about an unknown date before June 28, 2016, Defendant-Representative

Davis obtained from the office of the Clerk of the Alabama House of Representatives copies of

the recorded videos of the April 13, 2016 hearing.  On or about June 28, 2016, Davis attempted

to electronically transmit those copies to Defendant Gilbert.

## M.    May of 2016: Gilbert Prepares for Future Legislation and Offers to Repay Hammon's Debt

174.    In or about May of 2016, Defendant Gilbert began discussing with Representative

Hammon the possibility of introducing legislation during the 2017 session of the Alabama

Legislature that would be helpful to Trina Health and adverse to BCBS-AL.  Gilbert asked

Representative Hammon to assist with such legislative efforts—either overtly or covertly.

175.    On or about May 12, 2016, Defendant Gilbert sent an email to Representative

Hammon asking for information regarding who to contact with Regions relating to Hammon's

debt, which was still unpaid and due.  Hammon emailed that information to Gilbert.

176.    Later on or about May 12, 2016, Defendant Gilbert sent an email to Regions

Attorney A.  In that email, Gilbert informed Attorney A that Trina Health was about to become

profitable.  He proposed that when Trina Health became profitable, Representative Hammon's

"bill will be paid directly from Trina from fees due."  Gilbert proposed that Regions and Trina

Health enter into a contract obligating Trina Health to repay Hammon's debt.

177.     Subsequently, Regions granted Representative Hammon another extension of an unspecified length to repay the loan.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
(Bribery Concerning a Program Receiving Federal Funds)

178.     The factual allegations contained in paragraphs 1 through 177 of this Superseding Indictment are hereby realleged and incorporated herein as if copied verbatim.

179.     In or about February of 2015, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

G. FORD GILBERT,
a/k/a "Gregory Gilbert,"

aiding and abetting another, and aided and abetted by another, directly and indirectly, corruptly did give, offer, and agree to give a thing of value to a public official with intent to influence a public official in connection with a transaction and series of transactions involving $5,000 or more; that is, Defendant Gilbert offered and gave to Representative Hammon the right to be a first-level seller of territorial rights to open Trina Health-affiliated clinics within designated geographic areas, thus allowing Hammon to receive finder's fees for selling territorial rights to second-level investors, in order to corruptly influence Hammon, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(1)(A) and Title 18, United States Code, Section 2.

## COUNT 3
(Bribery Concerning a Program Receiving Federal Funds)

180.     The factual allegations contained in paragraphs 1 through 179 of this Superseding Indictment are hereby realleged and incorporated herein as if copied verbatim.

181.     In or about February of 2016, in Montgomery County, within the Middle District

of Alabama, and elsewhere, the defendant,

G. FORD GILBERT,
a/k/a "Gregory Gilbert,"

aiding and abetting another, and aided and abetted by another, directly and indirectly, corruptly did give, offer, and agree to give a thing of value to a public official with intent to influence a public official in connection with a transaction and series of transactions involving $5,000 or more; that is, Defendant Gilbert offered and gave to Representative Hammon assistance in causing a creditor of Hammon's, Regions, to grant Hammon an extension of time to repay his outstanding debt, in order to corruptly influence Hammon, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(1)(A) and Title 18, United States Code, Section 2.

**COUNT 4**
(Bribery Concerning a Program Receiving Federal Funds)

182.    The factual allegations contained in paragraphs 1 through 181 of this Superseding Indictment are hereby realleged and incorporated herein as if copied verbatim.

183.    On or about April 7, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

G. FORD GILBERT,
a/k/a "Gregory Gilbert,"

aiding and abetting another, and aided and abetted by another, directly and indirectly, corruptly did give, offer, and agree to give a thing of value to a public official with intent to influence a public official in connection with a transaction and series of transactions involving $5,000 or more; that is, Defendant Gilbert offered and gave to Representative Hammon $2,000, in order to corruptly influence Hammon, as opportunities arose.

51

All in violation of Title 18, United States Code, Section 201(b)(1)(A) and Title 18, United States Code, Section 2.

## COUNT 5
(Bribery Concerning a Program Receiving Federal Funds)

184.    The factual allegations contained in paragraphs 1 through 183 of this Superseding Indictment are hereby realleged and incorporated herein as if copied verbatim.

185.    On or about May 12, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

G. FORD GILBERT,
a/k/a "Gregory Gilbert,"

aiding and abetting another, and aided and abetted by another, directly and indirectly, corruptly did give, offer, and agree to give a thing of value to a public official with intent to influence a public official in connection with a transaction and series of transactions involving $5,000 or more; that is, Defendant Gilbert offered and gave to Representative Hammon an offer made to Hammon's creditor, Regions, to personally repay Hammon's outstanding debt if the creditor granted Hammon additional time to repay the debt, in order to corruptly influence Hammon, as opportunities arose.

All in violation of Title 18, United States Code, Section 201(b)(1)(A) and Title 18, United States Code, Section 2.

## COUNT 6
(Violation of the Travel Act)

186.    The factual allegations contained in paragraphs 1 through 185 of this Superseding Indictment are hereby realleged and incorporated herein as if copied verbatim.

187.    On or about April 11, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

G. FORD GILBERT,
a/k/a "Gregory Gilbert,"

traveled in interstate and foreign commerce from Mexico to Montgomery, Alabama with the

intent to promote, manage, establish, and carry on, and facilitate the promotion, management,

establishment, and carrying on of an unlawful activity, to wit: (1) bribery involving a principal of

a lobbyist, in violation of Title 36, Section 36-25-5.1(a) of the Code of Alabama; (2) bribery, in

violation of Title 13A, Section 13A-10-61 of the Code of Alabama; and (3) bribery concerning a

program receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(2),

as alleged in Counts 2 through 6 of this Superseding Indictment, and thereafter performed and

attempted to perform an act to promote, manage, establish and carry on, and to facilitate the

promotion, management, establishment and carrying on of such unlawful activity.

All in violation of Title 18, United States Code, Section 1952(a)(3).

## COUNT 7
(Violation of the Travel Act)

188.    The factual allegations contained in paragraphs 1 through 187 of this Superseding

Indictment are hereby realleged and incorporated herein as if copied verbatim.

189.    Between in or about April of 2016 through in or about June of 2016, in

Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

G. FORD GILBERT,
a/k/a "Gregory Gilbert,"

used a facility in interstate or foreign commerce, namely, email communications, with the intent

to promote, manage, establish, and carry on, and facilitate the promotion, management,

establishment, and carrying on of an unlawful activity, to wit: (1) bribery involving a principal of

a lobbyist, in violation of Title 36, Section 36-25-5.1(a) of the Code of Alabama; (2) bribery, in

violation of Title 13A, Section 13A-10-61 of the Code of Alabama; and (3) bribery concerning a

program receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(2), as alleged in Counts 2 through 6 of this Superseding Indictment. All in violation of Title 18, United States Code, Section 1952(a)(3).

## COUNT 8
(Violation of the Travel Act)

190. The factual allegations contained in paragraphs 1 through 189 of this Superseding Indictment are hereby realleged and incorporated herein as if copied verbatim.

191. On or about June 28, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

RANDALL M. DAVIS,

used a facility in interstate or foreign commerce, namely, email communications, with the intent to promote, manage, establish, and carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit: (1) bribery involving a principal of a lobbyist, in violation of Title 36, Section 36-25-5.1(a) of the Code of Alabama; (2) bribery, in violation of Title 13A, Section 13A-10-61 of the Code of Alabama; and (3) bribery concerning a program receiving federal funds, in violation of Title 18, United States Code, Section 666(a)(2), as alleged in Counts 2 through 6 of this Superseding Indictment. All in violation of Title 18, United States Code, Section 1952(a)(3).

## COUNT 9
(Making a False Statement)

192. The factual allegations contained in paragraphs 1 through 191 of this Superseding Indictment are hereby realleged and incorporated herein as if copied verbatim.

193. On or about November 29, 2016, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendant,

54

MARTIN J. CONNORS,

did willfully and knowingly make a materially false, fictitious, and fraudulent statement and

representation in a matter within the jurisdiction of the executive branch of the government of

the United States, by stating to a United States Postal Inspector that he (Connors) did not know,

during the period that H.B. 415 was pending before the Alabama Legislature, that Representative

Hammon was a part-owner and investor in a Trina Health-affiliated clinic.  The statement was

false because, as Connors then and there knew, Connors did know, during the period that H.B.

415 was pending before the Alabama Legislature, that Hammon was a part-owner and investor in

a Trina Health-affiliated clinic.

All in violation of Title 18, United States Code, Section 1001.

## FORFEITURE ALLEGATION-1

A.       The allegations contained in Counts 1 through 8 of this superseding indictment are

hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to

Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section

2461(c).

B.       Upon conviction of the offenses in violation of Title 18, United States Code,

Sections 201(b)(1)(A), 371 and 1952(a)(3), set forth in Counts 1 through 8 of this superseding

indictment, the defendants,

G. FORD GILBERT,
a/k/a "Gregory Gilbert,"
MARTIN J. CONNORS, and
RANDALL M. DAVIS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C)

and Title 28, United States Code, Section 2461(c), any and all property, real or personal,

constituting or derived from proceeds defendants obtained directly or indirectly as a result of the said violations including, but not limited to, a Forfeiture Money Judgment.

C.      If any of the property described in this forfeiture allegation, as a result of any act or omission of the defendants:

(1)     cannot be located upon the exercise of due diligence;

(2)     has been transferred or sold to, or deposited with, a third party;

(3)     has been placed beyond the jurisdiction of the court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

## FORFEITURE ALLEGATION-2

A.      The allegations contained in Count 9 of this superseding indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(7).

B.      Upon conviction of the offenses in violation of Title 18, United States Code, Section 1001, set forth in Count 9 of this superseding indictment, the defendant,

## MARTIN J. CONNORS,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real or personal, constituting or derived from proceeds the said defendant obtained

56

directly or indirectly as a result of the offenses in violation of Title 18, United States Code, Section 1001 including, but not limited to, a Forfeiture Money Judgment.

      C.      If any of the property described in this forfeiture allegation, as a result of any act or omission of the defendant:

      (1)      cannot be located upon the exercise of due diligence;

      (2)      has been transferred or sold to, or deposited with, a third party;

      (3)      has been placed beyond the jurisdiction of the court;

      (4)      has been substantially diminished in value; or

      (5)      has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

      All pursuant to Title 18, United States Code, Section 982(a)(7).

A TRUE BILL:

_____
Foreperson

_____
LOUIS V. FRANKLIN, SR.
UNITED STATES ATTORNEY

_____
Jonathan S. Ross
Assistant United States Attorney

_____
R. Randolph Neeley
Assistant United States Attorney